IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARCO NATIONAL INSURANCE )
COMPANY, )
 )
        Petitioner, )
 )
    vs. ) No. 05 C 2397
 )
MILLENIUM INSURANCE )
UNDERWRITING LIMITED (on its own )
behalf and on behalf of all other members )
and/or capital providers of LLOYDS )
SYNDICATE 1245 for the 2004 Year )
of Account), )
 )
        Respondent. )

## MEMORANDUM OPINION AND ORDER

Harco National Insurance Company (Harco) petitions the court to compel arbitration between Harco and Millenium Insurance Underwriting Limited (Millenium) to resolve a dispute regarding the reinsurance of a bail bonds liability. Millenium contends that the parties never executed the proposed contract for reinsurance and therefore did not agree to arbitrate. Based on the undisputed facts, we find that Harco and Millenium did agree to arbitrate and grant Harco's petition.

## BACKGROUND

Harco is an insurance company incorporated and headquartered in Illinois. Millenium, a British corporation headquartered in London, England, is a member of Syndicate 1245 (Syndicate), an underwriting syndicate at Lloyds of London. In 2004, Harco acted as a surety for bail bonds issued by Capital Bonding Company (CBC). Prior to assuming this liability, Harco, through its broker Christopher Rich, contacted the Syndicate to inquire about

reinsurance for the 2004 bail bonds. Rich spoke with Justin Tweedie, an employee of Heritage Managing Agency Limited, which managed various Lloyd's underwriting syndicates, including Syndicate 1245. Tweedie was the Syndicate's main underwriter.

Tweedie and the Syndicate had prior experience with CBC. In 2001 and 2002, the Syndicate had provided reinsurance on CBC bail bonds to a carrier other than Harco. In 2002, the Syndicate had to pay this carrier over two million dollars to remedy CBC's cash flow problems. Despite CBC's promises, the money had not yet been repaid. Given this history, Tweedie sought assurances that CBC would repay its debt and that similar problems would not arise in the event the Syndicate once again provided reinsurance for CBC bail bonds. At a meeting on January 5, 2004, Tweedie told Rich that the Syndicate would underwrite 7.5 per cent of the reinsurance if certain issues were resolved. Tweedie requested that CBC explain why the cash flow problems that occurred in 2002, resulting in the Syndicate's payout, would not recur in 2004; that it provide a repayment schedule for the money owed; and that it clarify its request for a letter of credit covering possible losses.

Responding to these concerns, Vincent Smith, the president of CBC, sent Rich an e-mail, which was forwarded to Tweedie. In his e-mail, Smith stated that the previous cash flow problems were largely the result of defamatory statements made about CBC by its competitors, and that subsequently CBC filed a federal court action against those competitors. Smith also informed Rich that Harco would be exercising more control over CBC's revenue and that the reinsurers would be repaid out of the funds turned over to Harco on a monthly basis. As to the letter of credit, Smith clarified that he needed a letter for one year to secure a line of credit with a local bank. He stated that he would provide a corporate and personal guarantee that the credit would not be drawn down. After further discussion with Rich and an e-mail from

him elaborating on Harco's control over CBC, Tweedie indicated that the Syndicate would be willing to underwrite 7.5 per cent of the reinsurance for the bail bonds.

On February 19, 2004, Tweedie affixed the Syndicate's stamp on the placement slip for the bond reinsurance. The slip identifies the type of contract as a "Bond Quota Share Reinsurance Agreement," and sets the reinsurance percentage at 7.5 per cent. Under the heading "General Conditions," the placement slip lists "Arbitration Clause" and "Governing Law Clause (Illinois)," without further elaboration.[1] Tweedie made several additional annotations on the placement slip in pencil, two of which are relevant to our inquiry. He drew a line through the Syndicate's stamped number and also wrote "Sub indemnification letter + length." In his affidavit, Tweedie states that his intention in making these marks was to condition the execution of the placement slip on two "subjectivities": letters of indemnification from CBC and Smith, and a written confirmation of the length of the bonds issued by CBC. He states that under common practice in London, the Syndicate was not bound by the placement slip until the insurer removed the pencil line from its stamp.

On February 25, 2004, Rich sent Tweedie an e-mail, with an attached message from Smith, concerning the two express conditions. Smith's e-mail stated that the average length of the bonds was six months, and that the corporate and personal guarantee documents were being prepared that day and would be sent out for distribution that night. Rich wrote to Tweedie, "I would like to get this wrapped up this week and would appreciate your advice as to whether I can now get your qualifications removed from your line and cover note?" Tweedie

---

[1] These brief listings are common in placement slips because they are used in the reinsurance industry as abbreviated agreements and are often, though not always, succeeded by contracts that detail all the terms. Regardless of whether a succeeding contract is issued, these slips are treated as binding contracts. *See* CNA Reinsurance Co., Ltd. v. Trustmark Ins. Co., 2001 WL 648948 at *1 (N.D.Ill. 2001).

responded, "I am happy to remove our qualifications," and informed Rich that he would be at the Syndicate's underwriting box that afternoon. In his affidavit, Rich states that the same day he went to the Syndicate's underwriting box to watch Tweedie erase the line through the Syndicate's number and his two qualifications from the placement slip. He further contends that Tweedie wrote on the slip that a copy of the indemnifications would be provided by March 1, 2004. Tweedie states that he does not recall erasing his conditions or the line through the Syndicate's number. Harco does not dispute that the Syndicate never received the guarantees. Harco claims that it sent the Syndicate its share of the premiums pursuant to its reinsurance agreement, but that the Syndicate did not pay for its share of the liabilities. The Syndicate denies that it was ever bound by the placement slip and that it received premium payments.

On January 19, 2005, the Syndicate filed an action against Harco in the Queen's Bench Division of the High Court in London, England, seeking a declaration that it was never bound to reinsure, or that it has validly avoided reinsurance of the CBC bonds. On April 22, 2005, Harco sent a letter to the Syndicate requesting that it submit its dispute for arbitration in Rolling Meadows, Illinois, and simultaneously filed this action to compel arbitration against Millenium, on its own behalf and on behalf of all the members of the Syndicate for 2004.

## DISCUSSION

Harco asserts that the court has both diversity jurisdiction and jurisdiction pursuant to 9 U.S.C. § 203, which grants federal district courts original jurisdiction over proceedings that involve arbitration agreements that fall under the Convention on Recognition and Enforcement of Foreign Arbitral Awards. Millenium contests that the court has jurisdiction under § 203 because it denies that the parties ever agreed to arbitrate. Nonetheless, Millenium does not dispute that the court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

Under the Federal Arbitration Act "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Where the execution of an arbitration agreement and the party's failure to comply are not in question, the court issues an order directing the parties to arbitrate in accord with their agreement. *Id.* However, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id.* Millenium argues that there is a question of fact as to whether the parties ever entered into the agreement for reinsurance, which contained the arbitration clause, and therefore, a trial is necessary.

Millenium contends that Tweedie's pencil notations – the line through the Syndicate's number and the phrase "Sub indemnification letter + length" – were conditions precedent to the execution of the parties' reinsurance agreement. Millenium asserts that under British custom the pencil line through the Syndicate's stamped number indicated that the insurer was not bound by the contract and Tweedie's phrase, "Sub indemnification letter + length," subjected the contract to two conditions or subjectivities: a letter of indemnification from CBC and Mr. Smith, and written confirmation of the length of bonds issued under CBC's bail bond program. Harco does not contest either of these assertions. However, it does dispute Millenium's conclusion that since the letters of indemnification were never provided, the conditions precedent were not met and the contract never took effect.

Millenium would have a stronger argument if undisputed facts did not reveal that Tweedie removed his conditions precedent and entered into the agreement with Harco prior to receiving the letters of indemnification. The original placement slip evidences Tweedie's

removal of the conditions precedent. In his affidavit, Christopher Rich testifies that Tweedie erased his pencil line and the phrase, "Sub indemnification letter + length," from the placement slip on February 25, 2004. A copy of the slip attached to his affidavit as exhibit 3 does not contain these conditions. Tweedie does not deny that he erased these marks. Rather, he states in his affidavit that he does not recall erasing his notations from the slip.

Regardless of his memory of the event, Tweedie's e-mail from February 25, 2005, indicates a clear willingness to lift the conditions. Rich sent Tweedie an e-mail to address his concerns regarding indemnification and bond length. Rich attached an e-mail from Vincent Smith, president of CBC, which stated that he was drawing up corporate and personal guarantee forms to be distributed to the participating reinsurers, and that the average length of CBC's bail bonds was six months. In his e-mail, Rich wrote, "I would like to get this wrapped up this week and would appreciate your advice as to whether I can now get your qualifications removed from your line and cover note?" Tweedie's e-mail response stated, "Thanks for that. I am happy to remove our qualifications. I am at the box this pm but am away Thursday and Friday so if you can't get in to see me, please see Richard Bryant." Millenium argues that Tweedie's e-mail response does not evidence an intent to remove the qualifications right then, but rather an intent to lift the subjectivities once he had received the requested indemnifications. To the contrary, Tweedie's e-mail evidences a clear intent to lift the subjectivities immediately. Rich asked if he could *now* get Tweedie's qualifications removed, to which Tweedie replied he is happy to lift them and indicated that Rich could come over to the Syndicate's box that day in order to remove them. Rich testifies that he did indeed go over to the Syndicate's box that day and watch Tweedie remove his conditions. The notation that the indemnifications would be provided by March 1, 2004, further indicates that Tweedie

did not wait for their receipt before lifting his subjectivities. Tweedie's failure to recall this event does not create an issue of fact in light of the slip, Rich's affidavit, and Tweedie's e-mail correspondence with Rich.

The parties entered into an agreement that listed an arbitration clause as a general condition and identified Illinois law as governing. As Harco points out, the courts have held that the phrase "arbitration clause" in a contract is sufficient to establish the parties' agreement to arbitrate disputes, see CNA Reinsurance Co., Ltd., 2001 WL 648948 at *6 n.4 (citing to two district court cases that have found this "skeletal phrase" to create a binding agreement to arbitrate, Allianz Life Insurance Co. v. American Phoenix Life and Reassurance Co., 2000 WL 34333013 at *3 (D.Minn. 2000) and North Carolina League of Municipalities v. Claredon National Insurance Co., 733 F.Supp. 1009, 1011 (E.D.N.C. 1990)). However, this phrase provides no guidance as to the details of the arbitration, i.e., its location and the selection of arbitrators.

The parties' reinsurance agreement states that the wording of the agreement, including that of the arbitration clause, is "[t]o be agreed by lead underwriter." Harco maintains that the lead underwriter on its CBC bond liability was the Hiscox Syndicate, with which Harco had entered into an agreement over two months before the execution of its agreement with Syndicate 1245. The Hiscox Syndicate is the lead underwriter, Harco argues, because it was the first syndicate to reinsure the CBC bond program for 2004 and it accepted a larger portion of the risk than the other insurers. Therefore, Harco contends, the more detailed arbitration terms provided in its agreement with the Hiscox Syndicate apply to its arbitration agreement with Syndicate 1245 because those are the terms of the lead underwriter.

Millenium disputes the contention that the term "lead underwriter" in the placement

slip refers to the Hiscox Syndicate. Millenium argues that under accepted practice in the London reinsurance market, the term "lead underwriter" in a placement slip refers to the first insurance company to sign that placement slip, differentiating it from those insurers who subsequently sign the same slip. Since the Hiscox Syndicate entered into an agreement with Harco on another slip, Millenium argues that it is not the lead underwriter for purposes of Syndicate 1245's agreement with Harco. Rather, Millenium argues that Syndicate 1245 is the lead underwriter as the first and only reinsurer on the placement slip.

Whether the Hiscox Syndicate or Syndicate 1245 is the lead underwriter referred to on the placement slip is a factual dispute that would require a hearing in order to resolve. In its reply brief, Harco indicated that if the motion to compel arbitration was granted, the parties might be able to agree to the terms of arbitration. We encourage the parties to try to negotiate those details. If they cannot come to an agreement on the terms of arbitration, and if they maintain their conflicting positions as to the identity of the lead underwriter, we will hold a hearing on that issue. Of course, the hearing may make clear that the parties never agreed to detailed terms for the arbitration, in which case the court may fill the gaps of the arbitration agreement pursuant to the Federal Arbitration Act. Schulze and Burch Biscuit Co. v. Tree Top, Inc., 831 F.2d 709, 716 (7th Cir. 1987).

## CONCLUSION

Harco's petition to compel arbitration is granted.

JAMES B. MORAN
Senior Judge, U. S. District Court

Aug. 3, 2005.